All right, ask all the lawyers to step up if you would, please, to the podium. Identify yourself, and then we'll just talk about time frame for now. And, uh, counsel? Good morning. Carl Corral for Atlanta. Spell your last name. T is in table. T-E-R-R-E-L-L-A-T-E. Thank you. And? Good morning. Jane Anderson, I'm the CAF of Carolyn Richardson's, the DCP. Thank you. Good morning, Your Honor. It's Tim Maggio, M-A-G-G-I-O, Assistant Attorney General on behalf of the Human Rights Commission. Thank you very much. All right. Now, you'll get 15 minutes, of course, counsel. I don't know if you want to reserve some time for rebuttal. I would like to reserve time. You would? Fine. And we're pretty liberal here. Um, if we're really involved in some good questioning and, or discussion, then we'll certainly let you go longer than that. Um, as far as your time, have you talked about how you want to divide that up, or? Yes, we have. What's your decision, then? I will take 15 minutes, and then Mr. Maggio will take five minutes. What do you think? Okay, fine. Sounds good. As long as we even it out at the end. Yeah. All right. Fair enough. Thank you. And I'll be seated, except for Mr. Turrell. Mr. Turrell, are you ready to proceed, sir? Yes, I am. All right. If you would, please. May it please the court, on behalf of Helen. Uh, the complainant was a sales employee in an urban hotel here in downtown Chicago. The hotel was sold in, um, on April 1, 2005, changed hands. And at that point, Greg Naylor, who was the supervisor in the sales department, came aboard at the hotel at that point. The respondent, West Faces Hotel Management Company, did not appear or become involved as the management company in the hotel until September of 2005. The focus in this case, um, was on the 2006 sales performance. There was, um, a meeting and a memorandum. Can we go back to Mr. Naylor, please? Yes. He was employed originally by CORE, was he not? He was employed for about two weeks by CORE. But he was a CORE employee, and then West Faces hired him on. Correct. Okay. West Faces hired everyone on. Uh, Mr. Naylor's first day employed by CORE was, um, February 28, 2005. Um, and at that point, he worked at another hotel that was, at that point, owned by the same owner for one month, during the month of March. Halfway during the month of March, two weeks in, CORE and the owner parted ways. So, Mr. Naylor was only employed by CORE, uh, for about two weeks. And, of course, the Freeman Statement, which I'm sure we're going to talk about today, that was reported by the outgoing general manager of the cellar, um, on February 23. February 23, she reported this hearsay upon hearsay that the new management company would not be hiring the, uh, two black African-Americans, African-American females. Mr. Trell, you make a reasonably valid argument about the hearsay with respect to that statement and respect to some other statements. But your opponents say you didn't object to it. And, therefore, the, especially in an administrative hearing where the rules of evidence are relaxed, um, can't, couldn't the administrative law just consider it for, as we say, whatever it was worth? Well, that's really what you're saying. Or isn't this argument forfeited? No, Your Honor. You're right. In an administrative hearing, the rules of evidence are relaxed. There's no jury. The judge, an administrative law judge, will typically take everything in. I did make several objections to the hearsay nature of the, of that comment and of other comments that were, uh, relayed by the outgoing general manager. Um. And is that Ms. Freeman? I'm sorry? Is that Ms. Freeman who made those statements? Yes. Okay. Ms. Freeman, the outgoing general manager, who was not connected whatsoever with CORE, not connected with the owners. She was simply the outgoing general manager. And this happened on February 23. Now, the testimony that came in, the ALJ heard it. ALJs will often take all kinds of evidence for whatever weight it is given. And the ALJ did, in fact, state in ruling on my hearsay objection that she would not be weighing it for the truth of the matter asserted. Well, counsel, when you look at the ruling made by the ALJ, does she have in there that's one of the reasons or one of the bases for her ruling, the Freeman hearsay? Um, it appears, I think quite clearly, that it prejudiced the administrative law judge in her decision. Okay. But she didn't rely on it in giving her ruling. She spends, I think, the first 20 pages of the 30-page decision discussing in great detail the so-called chain of events leading up to February 23. And then in her conclusion, she concludes by stating that the respondent targeted the complainant for discharge for reasons other than her job performance. So what is she referring to? What evidence is there in the record that supports the ultimate finding of fact that the Supreme Court says must be determined? And there is no evidence, Your Honor. It is fundamental, of course, that when a court of appeals reviews an administrative hearing, the findings upon which that ruling by the agency is based must be set forth in the order, or in the rulings and findings of the administrative agency. All that is pointed to in support of discrimination as the ultimate intent is the Freeman statement, which is clearly hearsay. And hearsay is clearly a stray remark, indeed a stray remark, of the most remote and extreme order. It was a statement made by a non-decision maker, employed by a non-party, 20 months before the final decision. And Mr. Naylor, there is not a shred of evidence reported in that opinion by the commission, in the decision by the commission, or in the record tying Mr. Naylor to this supposed decision that the outgoing general manager of the cellar reported. In fact, Mr. Naylor, and this is kind of where we got into this, Mr. Naylor's first day of employment, as I said, was February 28th. He testified, it's undisputed in the record, that he worked full time up until his last day at his previous employer before coming aboard on February 28th. He had never met the plaintiff. The evidence is also crystal clear that there's no evidence that he was engaged in any of the interviewing that took place prior to February 23. This decision was made, rather the reported decision by the outgoing general manager, Ms. Freeman, was stated on February 23. But wasn't there testimony that Mr. Naylor told the plaintiff to turn all your clients over to Ms. Corcoran, I believe, and if you don't like it, you can leave? Your Honor, that's not in the commission's report. That's not in the commission's finding. But is it in the record? Was it testimony before the ALJ? There was testimony by the plaintiff to that effect, to be sure. But the administrative law judge in her decision stated in the very first paragraph of her findings of fact, she said, allegations and evidence not set forth in this decision were deemed to be immaterial or not supported by the evidence. And the ALJ was correct in setting that forth because that is how appellate courts must review decisions of administrative agencies. There was an attempt by the complainant at the trial to show that she was disadvantaged in certain ways, was not given certain resources, and there was vigorous cross-evidence, counter-evidence to that. And guess what? The administrative law judge did not buy it. It's not a part of what supports the commission's record. We cited a long line of cases at the very end of our reply brief for the proposition that the administrative agency on appeal cannot attempt to argue evidence that wasn't relied upon by the commission in its decision. And I'll note that the commission's brief doesn't really attempt to do that, but the complainant's brief does. Mr. Trawley, are you suggesting that there's a standard that we have to apply basically to the effect of, in a case with lengthy testimony over the course of several days, which is what we have, the failure of the ALJ to specifically mention a nugget of evidence means that it's therefore off the table forever and ever and cannot be used to justify the ultimate result later on if we think it's more relevant than the ALJ thought it was. Because I think that Justice Conner's question was about the hotel management pulling the client base away from the plaintiff here, which undermined her ability to meet her sales goals. But we're not talking about just a nugget of evidence. We're talking about a main theory, an argument that the complainant attempted to persuade the ALJ of, and the ALJ clearly did not buy it. It's not anywhere in her opinion as support for her decision. Counsel, can we switch gears here a little bit? And let me ask you about the probationary period, when the three-pronged responsibility during their probation was revenue, entertainment, and prospecting. Is that correct? Those three goals were identified. Right. But prospecting and entertainment are merely tools for revenue generation. That's my question. I mean, how would she know what to focus on? Because she's a salesperson. Revenue generation is what the world of sales is all about. It's really common sense in the sales world. But weren't there standards set for the entertainment and the prospecting as well? Yeah. I mean, you know, that's a motivational tool. The main thing is revenue generation. She fell short by $100,000 of her reduced revenue goal at the end of that 90-day period. Now, like a lot of good managers, they want to make sure that the salespeople are using the tools that they should use, which is you make prospecting calls. You have entertainment events. That's how you meet your revenue. And revenue is all important. It is the raison d'etre, as I stated in my brief. What's the testimony in the record that suggests that, though, that anybody was told or they knew that the other things were interesting, but revenue was the focus? It's throughout the transcript. I do, in fact, have a footnote in my first brief where I cited a string of pages that support the proposition that revenue is the key. It's the central, essential focus of what happens. As Mr. Naylor stated several times, you know, that's our job as the sales department. If we don't generate revenue, then the owners of the hotel can't pay the bills, they can't pay the employees. At the end of the day, it's all about revenue, particularly in a big urban hotel like this, which is dependent upon driving in group business, and that was their job. So we have shown, we believe, by our briefs, that revenue was, of course, the most important thing. And this comes into the issue of the analysis of the pretext, the commission's pretext analysis. And it's quite well established, and I cited several Seventh Circuit cases for the proposition, that the analysis is limited to the honesty of the reason given, not the believability. Honesty is a narrower category than believable. Things can be non-believable for reasons other than dishonesty. As the Seventh Circuit stated, our only concern is the honesty of the employer's explanation. And that ties in with some familiar quotes that you've seen from the courts, and I think we cited at least several in our brief, that even if the employer's reason is outrageous, medieval, draconian, or if it's mistaken, even if it's mistaken, as long as it was the honestly held belief or rather decision made by the employer, then that's as far as the analysis goes. Secondly, the courts do not weigh the sufficiency of the reason. That is, the sufficiency of the reason from the employer's perspective, given the employer's right to make business decisions as the employer. And this is exemplified by the common expression that you see a lot in the Seventh Circuit, that courts do not sit as a kind of super-personnel department weighing the prudence of employment decisions. And this court has similarly stated in Acorn, Corrugated Box, 536 Northeast 2nd, 932 at page 944, that the task of the commission in this court is not to review and make determinations on the propriety of each disciplinary action taken. We cited several cases by this court as well as by the Seventh Circuit. I'll get to several cases from this court. But in Millbrook, Seventh Circuit case, 280, Fed Third, 1169, the jury, the court, the Seventh Circuit reversed a jury verdict in judgment in favor of the plaintiff. The jury was not allowed to weigh the competing, it was a failure to hire case. And the court held that the jury was not allowed to weigh the competing credentials of applicants in this failure to hire discrimination case because the criteria for failure to hire is uniquely within the employer's skill set, specialized knowledge. And this is why the courts say we do not sit as a super-personnel department. Let me ask you about an Illinois case, the Hicks case. Do you claim that it states that the plaintiff must show that there was intentional discrimination? That intent needs to be shown? Yes, although it is to be shown, unless you have direct evidence, it is to be shown by indirect circumstantial evidence. And on the line of indirect circumstantial evidence, there's a host of case law in this field that talks about this mosaic of facts. When you look at this fact and that fact and that fact, you look at it all as a big picture and suddenly you can discern that there's discrimination going on because you seldom have direct evidence. And what is difficult for your side of the case here, I think, is almost the simplicity of it. It comes down to two people, these two employees, the plaintiff and the other one. And this moving target of what they're supposed to do in terms of meeting goals or which goal is more important. And the AG's brief sets this out in a little chart. And I just wonder if you could comment on that mosaic issue for a minute and tell us why you get out of that problem. Because the only evidence that even suggests discriminatory intent is incompetent evidence and insupportable evidence. The Freeman testimony, the Freeman statement, not only because it was hearsay upon hearsay, but because it was hearsay upon hearsay. Let's say I give you the Freeman statement. Let's say that goes off the table. But still, don't we still have to chart with the goals that they were told and then they were told something different and then something else might have been used later on to call the firing? And underlying that whole matrix of numbers is the fact, which seems to be undisputed, that they pulled the client base away from the plaintiff before this all started happening and gave it to the other employee to up her numbers. Your Honor, once again, that was not part of the ALJ's decision. The ALJ squarely said in the first paragraph of her findings the fact that contentions and allegations not addressed herein were either not proved or deemed immaterial. And going back to your original question, Your Honor, the only other evidence that is identified in the decision is the demographic makeup of the department. And as we point out in our brief, case law is extremely clear on the fact that demographic evidence of this type is insufficient to prove discrimination. Stray remarks like Freeman are insufficient to prove discrimination. So we have to look at it this way. Where's the beef, like the old TV commercial? Where is the suggestion or evidence within this mosaic that suggests that the motivation, the reason was intentional discrimination? That's the ultimate factual inquiry. When you're looking at the issue of the sales numbers and the revenue and those other subgoals, which is how I prefer to refer to them, you're into the realm of the employer's right to make its decision based on how it knows to run the business. Just as in Millbrook, the court said that the jurors did not have the training or the knowledge to weigh the credentials of competing applicants here, the commission does not have the skill and the knowledge and the specialized knowledge that's essentially important to the fairly specialized knowledge of hotel sales. Before you run out of time, let me ask one follow-up on that. We've got an issue playing out there also that after the plaintiff was terminated in favor of the other candidate who allegedly had better numbers, that the other candidate's numbers were actually incorrect because there was a huge client that suddenly walked out the door and therefore had the corrected numbers been applied, the plaintiff would have been the winner of that little sweepstakes. Thank you for asking that question. That related specifically to her sales, that is Corcoran sales, in the month of December. It had nothing to do with the relevant period of September, October, November, that 90-day period. We explained in our brief the citations to both plaintiff's testimony and Mr. Naylor's testimony that the way it worked was you were given a revenue number based on the signed contract you got in the month. And then also in the month, if you had business that you booked many months earlier, if you had business that was actually in the hotel in that same month and they either canceled or they booked fewer rooms, then that was deducted from your revenue number for that month. So this was the system that was applied, and this is the system that the employer, using his business judgment, set up. It was the same system that applied to everybody. So the significance of what Your Honor is referring to is really just to the fact that in the following month, December, she had a low number or a negative number, I forget what it was, but that was because in that particular month, December, some business that she had booked much earlier had canceled. It had nothing to do with the probationary period that was set up. The fact of the matter is they were both put on the same program as set forth in the March 3, 2006 meeting and memorandum, which the ALJ neglected to mention, and it is also set forth in Exhibits C3 and C4, which are the 2006 month-by-month goals that each was to meet. That remained in place. And it was revenue and then average daily rate and number of room nights. But those two are simply component variables of what revenue is. If you sell more rooms but at a lower average rate, you can reach the revenue number that way, vice versa. If you sell rooms at a higher rate or rooms at a lower rate, but you sell a lot of rooms, you can still reach a revenue number. That in and of itself illustrates the central importance of revenue. As for the others, the prospecting and entertainment, those are simply tools. The record is really quite clear that it's all about revenue, and the record is also clear that there's insufficient competent evidence of discrimination. Thank you. Counsel, thank you for your presentation. Ms. Anderson? May it please the Court. In this case, the Commission's findings of fact are deemed prima facie true and correct. The Commission's decision will only be reversed if it is so against the manifest weight of the evidence that no rational person could agree with the Commission. This is, at its essence, a very straightforward discrimination case. It's governed by the McDonnell-Douglas burden-shifting analysis that is used to evaluate discrimination cases involving indirect evidence of discrimination. Under McDonnell-Douglas, if the Commission disbelieves the employer's stated reason for discharging an employee, the Commission's disbelief, coupled with the elements of the prima facie case, that disbelief is sufficient to establish discrimination on its own. It's pretext, and at that point, no further proof of discrimination is required. Now here, the Commission correctly stated the McDonnell-Douglas standard. It correctly applied the McDonnell-Douglas standard, and it correctly determined that it simply did not believe the respondent's stated reason for discharging the complainant. Counsel, may I ask you, what about your opponent's argument that maybe the ALJ didn't understand the hotel business, but all they were focused on was revenue, and the other two things that were mentioned during the probationary period were really important. It was all focused on revenue. What evidence of that is in the record? There's abundant evidence in the record showing that the respondent drafted the probationary notice, the respondent deliberately included these prospecting and entertainment goals. When the respondent sat complainant down to explain the probationary period, the respondent said exactly what was in the document. You have to meet each and every monthly sales goal. You have to meet the total sales goal. You have to meet each and every monthly entertainment and prospecting goal. There was never any discussion of, oh, if you just meet the revenue for the aggregate three-month period, that will be just fine. But, you know, even if you take respondent and focus on nothing but revenue, as respondent now wishes to do, at the end of the day, the complainant's 2006 revenue was 30% higher, more than 30% higher than the white 24-year-old that respondent retained. Even if you want to focus just on revenue during the three-month probationary period, Ms. Corcoran, the white 24-year-old, did not meet her revenue goals either. At trial, the complainant showed that Corcoran had not met the revenue goals. Respondent, nonetheless, padded her numbers, and in December used a fictitious cancellation to back that money out. Now, respondent stands before you and talks about a cancellation, but as was clearly presented at the trial, that cancellation is not in respondent's 2006 cancellation report. Respondent claimed it wasn't in the 2006 numbers because it wasn't processed until 2007. Well, logically and mathematically, if that cancellation was not processed in 2007, it could not possibly have reduced Corcoran's 2006 sales as respondent claims. Beyond that, and as the commission further pointed out in its decision, complainant and Ms. Corcoran were talking throughout this point. Ms. Corcoran repeatedly said she didn't make her sales goals, and at the end of December, well, in early December, I should say, after the complainant was terminated, she talked to Ms. Corcoran again and asked, and again Ms. Corcoran said, no, she didn't make her sales goals either, but nobody even said anything about it. So I think that even if you allow respondent to, after the fact, rewrite its probationary notice and change the standards, and even if we focus only on revenue, neither Corcoran nor complainant met the three-month revenue goal, and if anybody is going to fairly, if an employer really was concerned about, gee, which employee is likely to have the greatest sales, you would look at the employee who, through the entire year, did in fact have the greatest sales by more than 30%, and who on the very eve of her termination was about to land a $172,000 contract. So I think no matter which standard is employed, what the commission concluded is correct. Revenue just was not the honest reason for a respondent's actions. Let's switch gears for a minute and let's approach it this way. The evidence in this case that supports your client's position comes in two categories. One is what you just discussed, which is the whole revenue in the three-month period. The other one that's out there that you rely on is the Freeman Statement, and even if we get over the, well, it never was objected to, I mean, if we only had the Freeman Statement, would we have a case here? I mean, does that prove anything other than it's somebody's opinion, and it's 20 months before the event actually occurred? Well, and that is what the commission ruled. I mean, what the commission ruled was that the Freeman Statement absolutely was evidence of racist discrimination. How is that evidence of discrimination if someone simply says, I think the new owners are racist, and therefore you should quit before you're fired? How is that evidence of anything? And Freeman didn't testify, did she? No, she did not, Your Honor. Okay. But what the Freeman testimony was was that Ms. Freeman said that, told the two African-American employees they would not be retained because of their race and indicated that she was horrified by this decision and that those two employees should contact the Illinois Department of Human Rights. Now, vis-a-vis the commission's decision, I mean, the commission did not rely on that evidence. The commission ruled that while, yes, of course, that's evidence of discrimination, it was too remote in time. It was 20 months earlier and the decision to terminate complainants and the other African-American employee was rescinded. So when the commission ruled on the indirect evidence case, which had nothing to do with Freeman, the commission's indirect evidence decision does not ever even mention that. Your opponent seems to be making an argument that even though it was resolved only on the indirect part of the case, which is the revenue issue, that the Freeman statement so permeated the atmosphere that it tainted the ALJ's judgment-making ability and that therefore we have to get to some kind of remedy here to sweep the Freeman statement out of here. And I'm not really asking for it to be remanded for a fresh hearing or a mistrial or something. But I want to hear your spin on that. Okay, well, I don't think the commission did that at all. I don't think the ALJ did that. I think the ALJ did just what she said she did. She determined that the Freeman statement was too remote in time and had no bearing on the indirect evidence case. And just as a matter of review, the respondent is responsible for showing error. He cannot just assume something that is nowhere stated in the commission's decision because the commission's decision absolutely does not mention the Freeman testimony in connection with the indirect evidence case. Now, to the extent that the commission talked in the indirect evidence case about the fact that the complainant had been targeted, I think that that, if anything, is a reference to some of the evidence that Your Honors mentioned earlier that Mr. Naylor absolutely took sales files away from the complainant. And this was not just the complainant's testimony. This was the testimony of her former supervisor, Bill Navar, who saw Mr. Naylor come in on multiple occasions, take the files from Ms. Richardson and give them to Ms. Corcoran. I think that there was also extensive evidence of, and again, this is not just complainant, but the evidence of other former employees that the complainant was routinely talked down to, she was belittled, and she was treated in a way that wasn't normal in any workplace. She was socially ostracized. She was excluded. I mean, there is abundant evidence of targeting beyond just the Freeman statement. But I think above and beyond all else, from the commission's standpoint, was the fact that the respondent crafted the probationary notice, and it waited until after the end of the probationary period to pick and choose what standard to apply. And it did so in an extremely suspicious fashion, where it's relying on a cancellation it says wasn't even processed. And I think that that evidence, coupled with countless other instances where the commission just simply did not believe the respondent. I mean, time and time again the commission's decision points out that the respondent's arguments are so suspicious, they strain credulity. They're implausible. They're not credible. They're curious. They're difficult to believe. They're orchestrated. They're a ruse. I mean, all of this shows that the real issue here is that the commission just did not believe respondent's witnesses. The commission made credibility determinations, and ultimately it held that the respondent's stated reason for termination just wasn't credible. It wasn't believable. That's an actual determination that is deemed prima facie true and correct. I mean, the commission was the one that heard the witnesses, and that made the credibility determination. All right. Counsel, do you want to finish up? Okay. Very briefly. At the end of the respondent's reply brief, the respondent claims that the commission's decision can only be affirmed for the exact reason stated in the decision, and that simply is not an accurate statement of Illinois law. In Illinois, an administrative agency's decision can be affirmed for any reason stated in the record, and here both the reasons stated by the commission and for all the additional reasons that are stated in the administrative record, it's abundantly clear that there's overwhelming evidence which supports the commission's determination that the commission discriminatorily discharged the complainant based on her race and her age. Thank you. Thank you, Counsel. Mr. Maggio. Good morning, Your Honors. May it please the Court. Tim Maggio, Assistant Attorney General on behalf of the commission. Your Honors, I won't belabor the argument. I just want to raise a few points, if I may. Counsel for the appellant asks us, where's the beef, right? And as we look at the details and financial statements and things like that, we can't really sort of miss the bigger picture here. We had an over-40-year-old African-American woman and an under-40-year-old white woman that were given the same test, the same probationary test. Both of them failed, but only the over-40 African-American woman was fired, and she was replaced by an under-40 white woman. Where's the beef? Wes Paces comes back and says, well, it's all about revenue. But there are at least two problems with that. One, the test they gave, the probationary test they gave, and in just 20 seconds I'll get into that a bit more, it belies that. It says the test is not about just revenue. It says it's about revenue, it's about prospecting, it's about entertainment. Their own test says that. Second, if it were just about revenue, how do you fire the woman that has the very best actual record in terms of revenue? At the end of the day, Your Honors, I think there's really just two issues that are sort of before this court. If we boil it down. One is, are the Commission's factual findings against the manifest weight of the evidence stated differently? Can you take a look at this record and say there is nothing in the record such that no reasonable person could come to the conclusions that the Commission did? And second, did the Commission get the law right? Your Honors asked the question several times, where is the factual information in this record about there being three goals? And it's been alluded to, but it's the document. It's at C-436. Revised Group Goals. This was the document that was given to both Ms. Richardson and Ms. Corcoran and told, this is the one where the testimony was. This was the document given to them so that it would be clear cut, no questions, no questions asked. Everybody's on the same page. Everybody knows what's going on. And it says, it talks about revenue to be sure. And then it says, the sentence I'm sure we're all familiar with, quote, the trial period will also include the above noted prospecting call goals and entertainment goals. And then it finishes, the last sentence on the page, a failure to meet any will result in further performance review up to and possibly including termination. Mr. Naylor was asked about goals in his testimony. He gave that. We've given the citations in our brief. I don't think there's a need for us to do chapter and verse. But the other thing lurking factually is this notion that the probationary period was tied to it. We see this in the penalty period. It was actually tied to the earlier management policy. It's all part and parcel of the same thing. And that earlier policy focused on revenue, and so we need to sort of carry through. And that, too, is belied by the record. And we have this in our brief as well. Just one quick Q&A at page 431. Question. So you suspended the one policy and created another. Is that right? Answer. Based on the circumstances that were going on at that hotel, yes. Full stop. Same testimony again at page 438. So at the end of the day, there are two questions about the facts. One, is the appellant's rendition of the fact that there's nothing in the record accurate? We don't want to grab onto it. Second, since we find something in the record, can we say that there was nothing here and no reasonable person could reach the decision that the commission did? One quick point about the law. There is a flavor in the argument today that we're sort of looking back to what used to, I think, be called the pretext plus, right, that somehow was incumbent upon the plaintiff to come and show more than just the prima facie case, more than just the employer's proffered explanation to be false, but they had to do something more than that. And pretext plus, if that's the tag phrase for it, has been dead for quite some time. And we don't need to go any further than I think the Reeves case is the one people cite so much from the Supreme Court, making clear that it's absolutely dead. And again, one sentence, quote, a plaintiff's prima facie case combined with sufficient evidence to find that the employer's asserted justification is false may permit the trier effect to conclude that the employer unlawfully discriminated. That's the law of the land. And on this record, the commission was entitled to find discrimination. One other additional thing, there seems to be some kerfuffle going on now about whether there's a difference between an honestly held belief by an employer or a determination that the employer was not worthy of credibility or worthy of credence when it offered the explanation. I just don't see that as a real issue. I don't understand it. In all events, again, the U.S. Supreme Court in Burdine, 450 U.S. 248, the plaintiff may succeed, this is in terms of the Burdine, either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proper explanation is unworthy of credence. This is not an issue. It's a tempest and a teapot raised in the Brook Library. With that, Your Honors, thank you so much. Counsel, thank you. Counsel, five minutes, please. Your Honor, I'll try to go in reverse order. With respect to the pretext plus issue that Mr. DiMaggio raised, it may support, but it is always the case, remains the case under Zadaraka, remains the case, that the plaintiff must prove that it was pretext for discrimination. Now, on the sales issue, there's one incredibly important piece of testimony that supports the proposition that revenue was key in Seoul in the true central essential measure, and that was an admission by the plaintiff herself. It's at page 104, no, 102, 103 of the transcript. The plaintiff complainant was on direct examination. She was being asked about the meeting she had with Mr. Naylor and with Ms. Corcoran regarding the probationary period. And Ms. Richardson was asked the following question, so when you talked to Greg Naylor about it, about how this probationary period would work, did he tell you that it would be okay if you missed your prospecting goals just as long as you met your sales goals? Answer, yes, it was. She admitted that at page 102, 103 of the transcript. She knew, she understood, anybody in sales understands that it is all about sales. Prospecting and entertainment are not unimportant. They were goals that were imposed or placed there by the sales department to give them tools to motivate them to make sales, but at the end of the day, it's all about sales, and she fell short of her sales goal by $100,000, and that was a reduced sales goal. It was a 90-day sales goal. I'm referring to the probationary notice that Mr. DiMaggio made reference to. He reads the fine print, but it's clear. In the center of the form, it says 90-day probationary goal, 237,000-some-odd dollars. That was the goal. She fell short by $100,000. I still have to ask you, you keep focusing on these goals, but in order to meet the goals, you have to have clients, whether they are clients you solicit or somehow you're lucky they answer the phone when they happen to call in, but the plaintiff here had a client base, and it got pulled out by the employer here and given to the other candidate, and that's one of the most troubling facts in this record. But, Your Honor, that was a highly disputed issue at the trial, and once again, the AOJ said if I don't have it in my opinion, it was not proved or is deemed immaterial, and I would like to cite you to Illinois Supreme Court decision Reinhart. I cited it at page 18 of my reply brief. Reinhart, it stands for the proposition that it is fundamental that the decisions of administrative agencies must set forth the findings upon which judicial review can be based, and this is cited, Illinois Supreme Court cited to the U.S. Supreme Court decision in the Securities and Exchange Commission versus Cheney Report. But you're taking that statement, you're taking that rule of law and transforming it into what appears to be a different rule of law, which is if they don't state the fact in the administrative decision, then we as an appellate court or a court of review can't rely on the unstated fact to justify the ultimate result, and Ms. Anderson made the point that I thought was the law in Illinois, was that we can affirm an administrative agency on any ground that's in the record, whether they rely on it or not. This court looks at the manifest weight of the evidence, but we're not looking at a jury trial. We're looking at an agency which is obligated to set forth its facts. As stated in Kastner versus Estrue, which I cited, lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace. Well, there's a difference between what Mr. Maggio and the attorney general's office can use in their arsenal, in their blue brief, on the one hand, and then what we can use to justify affirming on the other hand, isn't there? Yes, Your Honor. We're not the agency. We don't have the same handcuffs they have. But to do what Your Honor is suggesting, you would have to go back through and read the entire transcript to make credibility. Well, I understand that. I understand that. But you would, as a court of appeals, you would be putting yourself in the place, the position, rather, of making credibility determinations. There was testimony that Ms. Anderson identified supporting the proposal, that she asserted, supported her argument that she was demeaned or not given the right tools, but there was ample counter evidence. The court of appeals cannot go back and read through that cold transcript and try to make credibility determinations of who to believe. That is what the administrative law judge did. That was her job. And her job is to set it forth in the opinion as findings. And as the Supreme Court of Illinois said, it is fundamental that the decisions of administrative agencies must set forth findings upon which judicial review can be made. On this issue of, as I said, the Seventh Circuit Court of Appeals, which I know this court follows in this area, at least that's my impression from reading numerous decisions in this field here, that honesty, the honestly held belief is what you look at. And I would point this court to St. Mary's Hospital, which we cited in our reply brief. And it's a case very similar to what we have here where the commission, I think the issue was the employee failed to show for work for three days and the factual issue had to do with whether the employee ever called in. And the commission disbelieved that and said to the effect that, you know, surely somebody would have picked up the phone and called the plaintiff employee before making the decision to terminate. This court, first district, reversed the commission and said notwithstanding this disbelief, however, and this is reading from this court's opinion, however, there is nothing in the order entered by the commission. Note the focus on what was entered in the order by the commission, which suggests that the hospital stated reason for discharging the complainant was a pretext for discrimination. Okay. Rather, the commission found that the explanation was incredible and it did not have good cause to discharge. So pretext alone, if that's established by the complainant, is not enough. I'm not saying there has to be pretext plus some additional evidence. It's pretext for discrimination. That's what's missing from this case. It certainly isn't supplied by the Freeman Statement. It certainly isn't supplied by the demographic data of the sales department. When you get into the weeds on the issue of revenue and the goals, the court is getting into an area that is left to the discretion of the employer in this context. The courts are not to second-guess the employers. The courts are not to sit as a super personnel department. The issue for this court is, is there sufficient competent evidence of discrimination? We respectfully submit there is not. Freeman evidence certainly statement doesn't do it. The demographic evidence doesn't do it. There's nothing else. There's nothing else in this record to support discrimination. Thank you, Your Honor. Thank you. Thank you very much, Counselors. All of you, you'll be hearing from us shortly. Thank you. Very good.